J-A07003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT CONVERY JR. | : | |
| | : | |
| Appellant | : | No. 902 MDA 2020 |

Appeal from the PCRA Order Entered June 17, 2020
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0005271-2015

BEFORE:   BOWES, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                **FILED: AUGUST 16, 2021**

Robert Convery, Jr. appeals from the denial of his Post-Conviction Relief Act ("PCRA") petition.  After careful review, we affirm.

In the fall of 2013, Pi Kappa Phi fraternity brothers, Appellant, Avery Jones, Kyle Balga, and Allen Mummert were living at 1040 Pike Street in the City of Reading, Pennsylvania where they were attending Albright College. N.T. Jury Trial, 6/14-15, 2016, at 34-36.  The brothers often hosted Pi Kappa Phi affiliated events and parties.  Appellant's bedroom was located next to the bathroom on the second floor.  *Id*. at 37.

On December 6, 2013, the residents of 1040 Pike Street held their annual Christmas date party.  *Id*. at 39-40.  Thomas Mitchell ("Mitchell"), a fraternity brother and friend of Appellant, attended the party.  At the party,

_____

[*] Former Justice specially assigned to the Superior Court.

Mitchell imbibed beer, liquor, and wine over a five- or six-hour period, before falling asleep on a couch that was located on the main floor of the residence. *Id*. at 42. A photograph posted on Facebook, depicted Mitchell "passed out" on the couch with a beer in his hand and an empty beer can laying on top of him. *Id*. at 43, Appendix A. When Mitchell awoke, he was in Appellant's second-floor bedroom, his pants and shoes were off, and Appellant was performing oral sex on him. *Id*. at 44. Mitchell could not remember how he moved from the couch to Appellant's room or when his pants were removed. *Id*. at 44-46. Shocked by the assault, Mitchell immediately fled the residence. *Id*. at 47.

The next morning, Appellant initiated a text conversation with Mitchell, wherein he said that "he was really sorry" and that "it wouldn't have happened if he was sober." *Id*. at 48. Mitchell did not know what had happened, so he was "confused" and "angry" with Appellant. *Id*. at 48. However, Mitchell did not save the messages or report the assault out of fear of public humiliation and a desire to forget the incident. *Id*. at 49-51. Instead, Mitchell forgave Appellant and permitted life to return to normal. *Id*. at 56.

The following school year, Appellant, Avery Jones, Kyle Balga, and Allen Mummert moved to 1610 North 11th Street. *Id*. 37-39. Their new residence continued to be the fraternity gathering spot. Mitchell still frequented Appellant's residence. *Id*. at 39. On November 22, 2014, Appellant and his roommates were hosting a party. Mitchell arrived around one or two in the morning after a night of bar hopping. *Id*. at 52-54. Mitchell was "heavily

intoxicated" and fell asleep while talking to people in Appellant's room. *Id*. at 55. Again, Mitchell awoke to find his pants missing and Appellant performing oral sex on him. *Id*. at 57. Mitchell fled to his own residence. *Id*. at 58-59.

As in the aftermath of the first assault, Appellant apologized for his actions through a text message conversation with Mitchell. *Id*. at 61-64. Mitchell preserved the messages, wherein Appellant affirmed the existence of a previous assault and asked Mitchell to pretend like "last night didn't happen," blaming his actions on his intoxication level. *Id*. at 62-64. Mitchell was still "afraid his peers would judge him" and did not report the assault. *Id*. at 66.

Two months later, the fraternity brothers threw another party at their residence. *Id*. at 154. During the party, Appellant's housemate and best-friend, Avery Jones ("Jones"), consumed alcohol for four to six hours, before going to sleep in his own room. *Id*. at 155. In the early morning hours of February 9, 2015, Jones awoke to find his pants removed and Appellant performing oral sex on him. *Id*. at 154-57. Jones pushed Appellant away, left his room, and proceeded to another housemate's room where he immediately told him what happened. *Id*. at 159. The next day, Appellant texted Jones asking for forgiveness and saying "that he had made a terrible mistake." *Id*. at 160. Over the next several days, Jones decided that he was not going to report the incident and deleted the text messages because he wanted to "wipe himself clean of the situation and having the text messages reminded him of it." *Id*. at 160.

Meanwhile, Mitchell learned of the assault of Jones through another fraternity brother, felt guilty that he had not reported Appellant's earlier assaults, and decided to speak with Albright's public safety officer. *Id*. at 67, 108-13. Mitchell did not tell the officer the full extent of what happened, because he was uncomfortable talking about it, but he did report "enough information so that he knew what happened." *Id*. at 118, 123. Afterwards, Mitchell approached Jones to see if he would also come forward. *Id*. at 119-20, 179. Jones met with Albright's public safety officer, explaining what happened to him. At the time Jones did not wish to pursue action against Appellant. However, he "changed his mind after he had time to reflect." *Id*. at 196-97. At Mitchell's request, the matter was referred to the local authorities. *Id*. at 69. Appellant was arrested and charged with three counts of Involuntary Deviate Sexual Intercourse ("IDSI") and three counts of sexual assault.

A jury trial was held on June 14, 2016, at which Appellant took the stand in his own defense. Appellant represented that the first two incidents with Mitchell were consensual and that Mitchell fabricated the sexual assault allegations because he did not want anyone to know about his sexuality. *Id*. at 211-12, 223-24. Appellant also testified that he slept in Jones's bedroom the night of the third incident, but that "nothing happened between them." *Id*. at 231. Appellant described his level of inebriation at all three events as intoxicated but functioning. *Id*. at 211, 223, 230-31. Appellant also testified that his step-sister, Alexandria Veight, was at the house and had knocked on

- 4 -

his bedroom door during the second incident. *Id*. at 226-27. Appellant denied texting Mitchell after the December 2013 incident, but confirmed that he sent text messages after the November 2014 and February 2015 events. *Id*. at 245. Appellant explained that although the November 2014 encounter was consensual, he "took the blame" because he didn't want Mitchell "to be worried about being caught or being called gay." *Id*. at 234-35. Finally, Appellant agreed that, while no assault happened, he texted with his then-best friend Jones for the last time after the third incident and that Jones had no further contact with him from that day forward. *Id*. at 247-48. Appellant had no explanation for why his best friend suddenly cut off all contact with Appellant. *Id*. The jury disbelieved Appellant's version of events, convicting him of all charges.

Following its assessment, the Pennsylvania Sexual Offender Assessment Board ("SOAB") recommended that Appellant be classified as a sexually violent predator ("SVP"). However, the trial court rejected the SOAB's determination and concluded that Appellant did not meet the criteria of SVP classification. At the IDSI counts, the trial court imposed three consecutive sentences of four and one-half to ten years imprisonment. The sexual assault convictions merged with the IDSI counts. Appellant received an aggregate sentence of thirteen and one-half to thirty years imprisonment. Appellant filed a post-sentence motion which was denied. A timely direct appeal followed in which Appellant challenged the discretionary aspects of his sentence. On February 15, 2018, we affirmed Appellant's judgement of sentence. ***See***

*Commonwealth v. Convery*, 185 A.3d 1122 (Pa.Super. 2018) (unpublished memorandum). On August 1, 2018, the Supreme Court denied Appellant's petition for allowance of appeal. *See Commonwealth v. Convery*, 190 A.3d 1126 (Pa. 2018).

Appellant filed a timely, counseled PCRA petition, asserting many allegations of ineffective assistance of trial counsel, an accusation of witness tampering by trial counsel, and an assertion that he had uncovered text messages between himself and Mitchell that were sent after the first incident. On August 21, 2019, the PCRA court held an evidentiary hearing, at which Appellant, Katelyn Johnson, who posted the photograph of Mitchell on Facebook, Alexandra Veight, trial counsel, and Robert Convery, Sr. testified. At the completion of the hearing, the PCRA court ordered that the notes of testimony be transcribed and that post-hearing briefs be submitted. Both the Commonwealth and Appellant filed briefs in support of their positions. On June 17, 2020, the PCRA court issued an order and opinion denying the petition. This appeal followed. Both PCRA counsel and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

A. Whether the [PCRA] court erred in denying [Appellant's PCRA] petition for a claim of ineffective assistance of counsel for trial counsel's failure to move to sever the two cases, as they involved different complainants, were not linked temporally, did not otherwise meet any standard for consolidation, and evidence of each would have been inadmissible at trial for the other and where [Appellant] established the claim is of arguable merit and [Appellant] established that counsel's

strategy was unreasonable as Appellant was prejudiced by this as each allegation served as impermissible corroboration of the other and thus improperly bolstered the credibility of each complainant.

B. Whether the [PCRA] court erred in denying [Appellant's PCRA] petition for a claim of ineffective assistance of counsel for trial counsel's failure to thoroughly interview Ms. Alexandra Veight pre-trial, prepare her to testify, and call her as an affirmative defense witness where [Appellant] established that Ms. Veight was known to the defense, her proffered testimony was known to the defense, she was available to the defense, and she was willing to testify at trial for the defense and [Appellant] established that counsel's strategy was unreasonable as Appellant was prejudiced by counsel's acts and/or omissions as they deprived him of the affirmative presentation of Ms. Veight's exculpatory information.

C. Whether the [PCRA] court erred in denying [Appellant's PCRA] petition for a claim of ineffective assistance of counsel for trial counsel's failure to object to the prosecutor calling Ms. Alexandra Veight solely for the purpose of impeaching her, and further failed to object to the prosecutor implying that Ms. Veight has an affirmative duty to report what she knew about [Appellant's] innocence to the police and that her failure to do so was grounds for the jury to disbelieve her testimony and permitted the prosecutor to paint her as part of a dishonest defense, all in a case where credibility was paramount and [Appellant] established that counsel's strategy was unreasonable as [Appellant] was prejudiced by counsel's acts and/or omissions as they deprived him of the affirmative presentation of Ms. Veight's exculpatory [information].

D. Whether the [PCRA] court erred in denying [Appellant's PCRA] petition for a claim of ineffective assistance of counsel for trial counsel's failure to thoroughly interview and present a vital witness, namely Katelyn Johnson, who was known to the defense, whose proffered testimony was known to the defense, who was available to the defense, and who was willing to testify for the defense at trial and [Appellant] established that trial counsel's strategy was unreasonable as [Appellant] was prejudiced by trial counsel's acts and/or omissions as they deprived him of Ms. Johnson's testimony which was critical to

establish [Appellant's] innocence as she had exculpatory evidence to offer.

E. Whether the [PCRA] court erred in denying [Appellant's PCRA] petition for a claim of ineffective assistance of counsel for trial counsel's failure to properly handle any and all information, evidence, and testimony regarding the text message conversation between Mr. Convery and the first complainant, Thomas Mitchell, after the alleged first incident wherein the alleged incident is discussed in detail including that Mr. Mitchell (alleged victim) held [Appellant's] head during the sex act and that Mr. Mitchell ejaculated as a result of the sex act, as counsel failed to investigate and/or hire an investigator to retrieve the aforementioned deleted text message conversation where the messages were not cumulative of either Mr. Mitchell's or [Appellant's] trial testimony about the first alleged incident and where [Appellant] established the claim is of arguable merit and [Appellant] established that counsel's strategy was unreasonable as [Appellant] was prejudiced by counsel's act and/or omissions as they deprived him of the affirmative presentation of the text message conversation between [Appellant] and Mr. Mitchell as without this missing favorable information, no other evidence existed to flesh out the details of the alleged first incident and to provide the mindset of both participants immediately following the alleged first incident, thereby supporting [Appellant's] position that Mr. Mitchell was aware of what was occurring and a willing participant and undermining the Commonwealth's assertion that Mr. Mitchell was unconscious and an unwilling participant.

F. Whether the [PCRA] court erred in denying [Appellant's PCRA] petition for a claim of ineffective assistance of counsel for trial counsel's failure to properly handle any and all information, evidence, and testimony regarding the text message conversation between [Appellant] and the first complainant, Thomas Mitchell, after the alleged first incident wherein the alleged incident is discussed in detail, including that Mr. Mitchell (alleged victim) held [Appellant's] head during the sex act and that Mr. Mitchell ejaculated as a result of the sex act, as counsel failed to elicit testimony from [Appellant] regarding the aforementioned deleted text message conversation where [Appellant], as a participant in that conversation, could have provided an accounting of Mr. Mitchell's behavior during the alleged first incident as memorialized through that text

conversation, and where [Appellant] established the claim is of arguable merit and [Appellant] established that counsel's strategy was unreasonable as [Appellant] was prejudiced by being deprived of the affirmative presentation of the text message conversation between [Appellant] and Mr. Mitchell as without this missing favorable information, no other evidence existed to flesh out the details of the alleged first incident and to provide the mindset of both participants immediately following the alleged first incident, thereby supporting [Appellant's] position that Mr. Mitchell was aware of what was occurring and a willing participant and undermining the Commonwealth's assertion that Mr. Mitchell was unconscious and an unwilling participant.

Appellant's brief at 5-8.

We begin with a discussion of the pertinent legal principles. Our "review is limited to the findings of the PCRA court and the evidence of record," and we do not "disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error." *Commonwealth v. Rykard*, 55 A.3d 1177, 1183 (Pa.Super. 2012). Similarly, "[w]e grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions." *Id*. "[W]here the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary." *Id*. "It is an appellant's burden to persuade us that the PCRA court erred and that relief is due." *Commonwealth v. Stansbury*, 219 A.3d 157, 161 (Pa.Super. 2019) (citing *Commonwealth v. Miner*, 44 A.3d 684, 688 (Pa.Super. 2012)).

Appellant raises several allegations of trial counsel ineffectiveness. Counsel is presumed to be effective, and a PCRA petitioner bears the burden

of proving otherwise. ***See Commonwealth v. Becker***, 192 A.3d 106, 112 (Pa.Super. 2018). To do so, a petitioner must plead and prove that: (1) the legal claim underlying his ineffectiveness claim has arguable merit; (2) counsel's decision to act (or not) lacked a reasonable basis designed to effectuate the petitioner's interests; and (3) prejudice resulted. ***Id***. The failure to establish any of the three prongs is fatal to the claim. ***Id***. at 113.

Appellant's first ineffectiveness claim concerns his attorney's failure to file a motion to sever the sexual assaults concerning Mitchell from the sexual assault involving Jones. ***See*** Appellant's brief at 18-31. At the PCRA hearing, trial counsel testified that he did not move for severance because he thought that evidence of each assault would have been admissible at the trial for the other assaults under Pa.R.E. 404(b). ***See*** PCRA Hearing, 12/13/19, at 112-13.

> With respect to the severance of offenses:
>
> Offenses charged in separate informations may be tried together if they are "based on the same act or transaction" or if "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion." Pa.R.Crim.P. 582(a)(1). The court has discretion to order separate trials if "it appears that any party may be prejudiced" by consolidating the charges. Pa.R.Crim.P. 583.

***Commonwealth v. Thomas***, 879 A.2d 246, 260 (Pa.Super. 2005). Our Supreme Court has consolidated these rules in a three-part test:

> Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate

- 10 -

indictments or informations, the court must therefore determine: [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

**Commonwealth v. Collins**, 703 A.2d 418, 422 (Pa. 1997) (quoting

**Commonwealth v. Lark**, 543 A.2d 491, 496-97 (Pa. 1988)).

The PCRA court, which was also the trial court, held that Appellant failed to establish arguable merit since the similarities between the three assaults would have allowed for the admission of each assault in the case of the other to demonstrate a common plan or scheme under Pa.R.E. 404(b). **See** PCRA Court Opinion, 6/17/20, at 19. The PCRA court reasoned:

In all three instances, the victims were intoxicated and unconscious, both victims awoke to find their pants partially removed and [Appellant] performing oral sex on them, both victims immediately left the room upon waking up, and in all three incidents, [Appellant] acknowledged the assault and pled forgiveness through text message. Both victims were white males in their early twenties, and both were fraternity brothers with [Appellant].

**Id**.

We agree with the PCRA court's analysis. Pursuant to Rule 404(b):

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

- 11 -

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b). In this appeal, the two pertinent 404(b) exceptions are "common plan or scheme" and "absence of mistake." Concerning the former, we have stated:

> When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

*Commonwealth v. Tyson*, 119 A.3d 353, 358-59 (Pa.Super. 2015) (*en banc*) (citation omitted); *see also id*. at 360 n.3 ("The common scheme exception does not require that the two scenarios be identical in **every** respect." (emphasis in original)).

- 12 -

Importantly, this Court has permitted other bad act evidence under the common plan exception "to counter [an] anticipated defense of consent." *Id*. at 361. In *Tyson*, the defendant, who was previously convicted of raping an unconscious woman, was accused of rape and related offenses after he allegedly engaged in sex with an unconscious acquaintance. The victim had invited the defendant over to bring her soup because she was not feeling well. Sometime after the defendant arrived, the victim fell asleep. She awoke to find the defendant engaging in vaginal intercourse with her. She told the defendant to stop and he complied. She told the defendant she did not want to have sex with him and fell back asleep. A short time later, she again awoke to Appellant having sex with her. The defendant claimed that the victim was conscious and had consented to having sex with him both times.

In a motion *in limine*, the Commonwealth sought a ruling that it could introduce the facts underlying the defendant's prior rape conviction under the common scheme exception. The trial court denied the motion, but on appeal we reversed, noting that:

> The factual overlap between the two incidents goes beyond the commission of crimes or conduct "of the same general class." The evidence does not merely show [the defendant] sexually assaulted two different women or that [his] actions are generically common to many sexual assault cases. To the contrary, the incidents reflect a clear pattern where [the defendant] was legitimately in each victim's home; [he] was cognizant of each victim's compromised state; and [he] had vaginal intercourse with each victim in her bedroom in the middle of the night while the victim was unconscious.

*Id*. at 360. We also determined that the five-year lapse in time between the rapes did not undermine the prior act's probative value, because the defendant was incarcerated for a majority of that time and because the "similarities [between] the two incidents render[ed] the five-year time gap even less important." *Id*. at 361.

Additionally, we held that the prior incident could be used to defeat an anticipated defense of consent in a case of sexual misconduct under the absence-of-mistake exception[1], reasoning:

> [the defendant] disputes [the victim's] account that she was asleep when [he] initiated sexual intercourse with her – [the defendant] maintains he thought [the victim] consented to the act. Given the relevant similarities between the two incidents, evidence of [the defendant's] prior rape would tend to prove he did not "mistakenly believe" [the victim] was awake or gave her consent. [The defendant] was invited into [the victim's] home of another reason, [he] knew [the victim] was in a compromised state, and [the victim] awoke to find [him] having vaginal intercourse with her. [The defendant's] prior conviction would likewise show he had been invited into the home of an acquaintance, knew the victim was in a compromised state, and had non-consensual sex with the victim while the victim was unconscious. The prior conviction would tend to prove [the defendant] was previously in a very similar situation and suffered legal consequences from his decision to have what proved to be non[-]consensual vaginal intercourse with an unconscious victim. Thus, the evidence would tend to show [the defendant] recognized or should have recognized that, as with [the prior woman raped

---

[1] "The standard for admission of evidence under the 'absence of mistake' exception is virtually the same as the common plan or scheme exception; namely, the evidence 'must be distinctive and so nearly identical as to become the signature of the same perpetrator, and its probative value must not be undermined by the lapse in time between incidents." *Commonwealth v. Gilliam*, 249 A.3d 257, 272 (Pa.Super. 2021) (citation omitted).

- 14 -

by the defendant], [the victim's] physical condition rendered her unable to consent.

*Id*. at 362-63.

Here, the PCRA court relied heavily on *Tyson*, finding it to be directly on point. Our review discloses that the PCRA court's analysis is amply supported by the record and the law. As in *Tyson*, the factual similarities between the three crimes went beyond "the commission of crimes or conduct of the same general class." *Id*. at 357. As the PCRA court explained, the three crimes involved men in their early twenties who were close friends and fraternity brothers of Appellant. Additionally, they attended a party at Appellant's house where Appellant was present and observed them drinking for several hours until they became intoxicated. Both men were unconscious at the time of the assaults and reported waking up in the middle of the night with their pants partially removed and Appellant's mouth on their penises. Hours later, Appellant contacted each victim over text messaging where he apologized, blamed his actions on his own intoxication, asked the victim not to speak of the incident, and assured the victim that it would never happen again. The almost two-year time span over which the three assaults occurred left a much shorter lapse between crimes than the one present in *Tyson*. *See also Commonwealth v. Aikens*, 990 A.2d 1181, 1185-86 (Pa.Super. 2010) (holding ten-year time lapse was not excessive for admissibility of evidence under the common plan exception). Finally, the defense position was that the victims were awake and the oral sex was consensual. Accordingly, as in

*Tyson*, the absence-of-mistake exception was an alternative avenue to admissibility.

Moreover, Appellant has failed to persuade us that the probative value was outweighed by the testimony's prejudicial impact. The Commonwealth was required to prove non-consensual oral sex occurred and limited its usage of the evidence to permissible grounds, *i.e.*, to show a common plan, scheme, or design and an absence of mistake. Accordingly, the PCRA court did not err when it held that a motion to sever would have been unsuccessful, since Mitchell and Jones's testimony would have been admissible at both trials. *See*, *e.g. Commonwealth v. Gordon*, 573 A.2d 866, 869-70 (Pa. 1996) (holding evidence of Appellant's similar prior sexual assaults was not unduly prejudicial under Rule 404(b)(2) where the Commonwealth was required to prove non-consensual sexual touching occurred; evidence was necessary for prosecution of case, where uncorroborated testimony of victim might lead jury to determine there was reasonable doubt as to whether appellant committed crime charged). Since the motion to sever would not have succeeded, counsel was not ineffective for failing to file one. *See Commonwealth v. Spotz*, 896 A.2d 1191, 1214 (Pa. 2006) ("[C]ounsel will not be deemed ineffective for failing to raise a meritless claim[.]"). Accordingly, Appellant's first claim fails.

In his second issue, Appellant challenges counsel's failure to call Appellant's step-sister, Alexandra Veight ("Veight"), as a defense witness at trial. The following principles apply to our consideration of this matter.

To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, appellant must prove: (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced Appellant. Trial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witness's testimony would have been beneficial or helpful in establishing the asserted defense. Appellant must demonstrate how the testimony of the uncalled witness would have been beneficial under the circumstances of the case.

*Commonwealth v. Chmiel*, 889 A.2d 501, 545-46 (Pa. 2005) (internal citations and quotation marks omitted).

At trial, Veight testified on rebuttal as a Commonwealth witness. *See* N.T. Jury Trial 6/14-15/16, at 259. Veight explained that she was visiting Appellant the night of November 23, 2014, when the second assault against Mitchell was alleged to have occurred. *Id*. at 260. That night she saw an "alert and awake" Mitchell laying on Appellant's bed with his pants down. *Id*. Though she later came to learn that Appellant was charged with assaulting an unconscious Mitchell that night, she never called the police to tell them she observed Mitchell to be conscious. *Id*. at 261.

At the PCRA hearing, Veight's testimony was consistent, but more expansive than her earlier trial testimony. On November 23, 2014, Veight testified that everyone except her was drinking alcohol at a party at Appellant's house with Mitchell, Appellant, and several other people. *See* N.T. PCRA Hearing, 12/31/19, at 64. Around four a.m. the party ended and she

- 17 -

observed Mitchell walk into Appellant's room, pull down his pants a little, and lay down on Appellant's bed. *Id*. at 66-67. Minutes later, she watched Appellant enter the room and close the door. *Id*. at 68, 80. Sitting in the hallway outside of Appellant's bedroom, Veight heard moaning coming from inside the room. *Id*. at 68-69. Approximately ten minutes later, Appellant exited the room and Veight entered the room. She saw Mitchell was awake and still laying on the bed, but with his pants pulled up. *Id*. at 70. Mitchell asked her where Appellant was. When Veight replied that she was unsure of Appellant's location, Mitchell left the room. *Id*. at 71. Veight also testified that when the Commonwealth brought charges against Appellant, she offered to testify at trial and met with trial counsel. *Id*. at 73-74. During the meeting, she recounted the events exactly as she testified at the PCRA hearing. *Id*. at 74-75. She believed that trial counsel would call her as a defense witness at trial, but instead, she was called by the Commonwealth as a witness. *Id*. at 83.

Trial counsel testified at the PCRA hearing that he was aware of Veight and had met with her prior to trial, though he alleged that she did not disclose the full extent of her account during their meeting. *Id*. at 94. After meeting with her, counsel concluded that it would be tactically advantageous if the Commonwealth introduced Veight as a witness and based on his meetings with the prosecutor he believed that the Commonwealth intended to call her as a witness. *Id*. at 94-95. Counsel reasoned that this strategy would be

beneficial to Appellant because the jury would hear evidence that supported his consent defense directly from the prosecution. *Id*. at 95. Since the Commonwealth called Veight and she testified to exactly what she had told him pre-trial, he thought that the strategy was successful. *Id*.

The PCRA court found that while there was arguable merit to Appellant's claim, he did not demonstrate prejudice by Veight's absence as a defense witness at trial. *See* PCRA Court Opinion, 6/17/20, at 23. Importantly, while Veight's testimony was "truncated" at trial, it was not absent. *Id*. at 23. Since the main thrust of her testimony was brought forth at trial, the PCRA court was not persuaded that the expanded version would have changed the outcome. *Id*. at 24-25 (citing N.T. Jury Trial, 6/14-15/16 at 260-61 (Veight testifying that she saw Mitchell alert and awake while laying on Appellant's bed with his pants down)). Finally, the PCRA court credited trial counsel's testimony that Veight's testimony at trial was exactly as recited to him during his meeting with her and that he made a strategic choice to cast doubt on Mitchell's version of events and corroborate Appellant's testimony through a Commonwealth witness. *Id*. at 25-26.

The record supports the PCRA court's conclusion that Appellant failed to prove that he was prejudiced by counsel's failure to call Veight as a defense witness. Indeed, Veight's testimony at trial corroborated Appellant's testimony that she was outside his door during the November 23, 2014 incident and that Mitchell was alert and awake. *See* N.T. Jury Trial, 6/14-

15/16 at 245-49). In closing argument, counsel capitalized on the fact that this corroborating testimony came from a Commonwealth witness. *Id*. at 285 (trial counsel pointing out that "you heard from the Commonwealth's own witness, [Appellant's] sister, that [Mitchell] was in that room awake that night."). Accordingly, the PCRA court did not err when it concluded that Appellant had failed to prove that he was prejudiced by the absence of Veight's expanded testimony at trial and his second issue fails.

In his related third claim, Appellant alleges that counsel was ineffective for failing to object to the Commonwealth's presentation of Veight's testimony in order to impeach her credibility. *See* Appellant's brief at 48. At the PCRA hearing, trial counsel testified that he employed a strategy of allowing Veight to be called as a Commonwealth witness in order to contradict the Commonwealth's position regarding Mitchell's willingness to engage in sexual activity during the November 2014 incident. *See* PCRA Hearing, 12/31/19, at 94-95. The PCRA court found trial counsel's testimony credible and persuasive evidence of a reasonable trial strategy. *See* PCRA Court Opinion, 6/17/20, at 26. As we highlight, *infra*, the PCRA court's findings are supported by the record.

"In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had *any* reasonable basis." ***Commonwealth v. Washington***, 927

A.2d 586, 594 (Pa. 2007) (citations omitted).  Trial counsel sought to allow the Commonwealth to call Veight as a witness so that the jury would hear testimony from a Commonwealth witness that corroborated Appellant's version of events.  *See* N.T. PCRA Hearing, 12/31/19, at 93-95.  While it is true that the Commonwealth questioned Veight about whether she reported her observations to the police, upon cross-examination trial counsel confirmed that Veight was unaware that she had any obligation to notify law enforcement.  *See* N.T. Jury Trial, 6/14-15/16, at 262.  Instead, she contacted trial counsel and offered to testify on Appellant's behalf.  *Id*.  Since trial counsel's decision was based upon a reasonable strategy to effectuate Appellant's interests, this claim fails.

In his fourth claim, Appellant alleges that counsel was ineffective for failing to call Katelyn Johnson ("Johnson") as a witness at trial.  *See* Appellant's brief at 53-63.  It is undisputed that Appellant has met the first four prongs of the uncalled witness test.  The parties contest the fifth prong, namely whether Appellant has demonstrated that he was prejudiced by the absence of Johnson's testimony at trial.  *See Chmiel*, *supra* at 545-46.

At the PCRA hearing, Johnson testified that, in 2013, she was a housemate and "very close" friend of Appellant.  N.T. PCRA Hearing, 12/31/19, at 41-42.  On the date of the first incident with Mitchell, Johnson did not attend the holiday party.  *Id*. at 44-45.  When she returned home that night, she found Mitchell alone and asleep on the couch.  *Id*. at 45.  As a joke,

Johnson took a photograph of Mitchell and posted it to Facebook. *Id*. This photograph was authenticated by Mitchell and admitted at trial. *See* N.T. Jury Trial, 6/14-15/16, at 43. Afterwards, she nudged Mitchell, who opened his eyes but did not move. *See* N.T. PCRA Hearing, 12/31/19, at 46. While Mitchell had a beer can laying on top of him, was holding a beer can, and did not get off the couch right away, Johnson thought that "he seemed fine." *Id*. at 46, 52-53.

Johnson left Mitchell and went downstairs to her room for approximately fifteen minutes. *Id*. at 46. During this time, she heard "rummaging through the kitchen cabinets," looked up the stairs, and saw Mitchell in the kitchen. *Id*. at 46. She returned to the main floor in time to observe a "slightly intoxicated" Mitchell walking upstairs where Appellant's bedroom, another bedroom, and the sole bathroom in the house were located. *Id*. at 46-47. Ms. Johnson did not see where Mitchell went once he got to the second floor and never saw anyone other than Mitchell that night. *Id*. at 56. Furthermore, while she texted Appellant earlier in the night, she did not receive a response until the next morning when he was "at the library." *Id*. at 57.

Appellant's recollection of the events differed greatly. In contrast to Johnson, Appellant testified that his only roommates were his fraternity brothers. N.T. Jury Trial, 6/14-15/16, at 207. After the December 2013 party, Appellant alleged that he was downstairs alone, cleaning up from the party when Mitchell, who had been sitting on the couch, "asked me to go upstairs

with him to my bedroom." *Id*. at 211. Appellant explained that he "followed [Mitchell] to my room and then we closed the door." *Id*. They began kissing before Mitchell eventually asked Appellant to perform oral sex on him, which he did. *Id*. Appellant agreed that "drunk or passed out people cannot consent to sexual activity." *Id*. at 245. However, he claimed that Mitchell did not fit into either category. Instead, he alleged that Mitchell was awake, conscious, and initiated the sexual encounter. *Id*. at 213.

Appellant argues that Johnson's testimony was "critical" to establish his innocence, since she saw Mitchell awake, contradicting Mitchell's trial testimony that he was intoxicated and could not remember how he got upstairs. *See* Appellant's brief at 55-57. The Commonwealth disputes whether Johnson's testimony contradicted Mitchell's version of events, since he testified that he could not remember how he got upstairs, not that he did not walk upstairs. Instead, the Commonwealth posits that Johnson's testimony would have been "problematic" for the defense, since it contradicted Appellant's testimony in important respects. *See* Commonwealth's brief at 20-21.

The PCRA court agreed with the Commonwealth, finding that Appellant was not prejudiced by the absence of Johnson's testimony and explaining:

> Given the disparity between the two versions, especially in the details accounting for both [Appellant's] and [Mitchell's] location and as to [Mitchell's] condition, it is difficult to perceive how such an imparity in those details would have benefitted [Appellant] at trial. While both [Appellant] and Ms. Johnson seem to describe [Mitchell] in a condition of at least some awareness,

the divergence in particulars between the two versions lends greater incredulity to the narrative of the defense rather than providing support for the trial strategy. [Appellant] attempts to confine the purpose of Ms. Johnson's testimony simply to dispute the Commonwealth's assertion at trial that [Mitchell] was intoxicated to the point of being unaware of how he got upstairs and into [Appellant's] bed. We refuse to view the testimony in such isolation, or attempt to narrow the consideration of the jury.

PCRA Court Opinion, 6/17/20, at 28.

The record supports the PCRA court's conclusion. The value of Johnson's testimony that she thought Mitchell seemed "fine" and observed him walk upstairs unassisted cannot be divorced from the rest of her testimony, which would have been detrimental to the defense. Instead of observing Appellant cleaning up the house after the party and engaging with Mitchell, Johnson found Mitchell passed out on the couch alone. Further, Johnson testified that she never saw or spoke with Appellant that night, despite sending him a text message. While she observed Mitchell walk unassisted upstairs, Mitchell never denied that this happened. Instead, he testified that he could not remember how he got to Appellant's room. Accordingly, Johnson's testimony did nothing to diminish Mitchell's credibility and counsel was not ineffective for failing to call her as a defense witness.

Appellant's final two claims concern counsel's failure to investigate, present, and question Appellant about newly discovered text messages that were sent between Mitchell and Appellant after the December 2013 assault. *See* Appellant's brief at 63-76. Appellant claims that the text messages would have bolstered his testimony that Mitchell was conscious and consenting to

- 24 -

the first encounter, that he deleted them at counsel's direction pre-trial, and that counsel was ineffective for not hiring a private investigator to recover the deleted messages so that he could present them at trial.  *Id*.  The Commonwealth counters that the messages would have been "devastating" for Appellant's case that this was a consensual sexual encounter.  *See* Commonwealth's brief at 25.  Therefore, counsel cannot be found ineffective for failing to investigate, uncover, or present the messages because their content would have been detrimental to the defense.  The PCRA court agreed. *See* PCRA Court Opinion, 6/17/20, at 31.

The record supports the PCRA court's conclusion.  At trial, Appellant testified that after the party ended, he proceeded downstairs and found Mitchell on the couch.  *See*.  After Mitchell asked Appellant to go upstairs to Appellant's bedroom, the two engaged in consensual sexual activity.  *Id*. Appellant denied that Mitchell was unconscious or impaired in any way during the encounter.  *Id*. at 212.  Further, Appellant testified that no text message conversation occurred after the December 2013 incident.  *Id*. at 245.

In the missing text message conversation Appellant conveys a strikingly different version of events than what he testified to at trial and what Johnson testified to at the PCRA hearing.  After initiating the conversation with a message that read, "Dude plz don't say anything," Appellant responds to Mitchell's question asking him what happened.  *See* PCRA Hearing, 12/31/19, at Com. Ex. 1.  Appellant explains that he and "Kate" were downstairs talking

when Mitchell "got up and went upstairs." *Id*. at 4. Appellant "assumed [Mitchell] went up to the bathroom." *Id*. This contradicts Appellant's trial testimony and Johnson's PCRA testimony that they were each alone with Mitchell downstairs. *See* N.T. Jury Trial, 6/14-15/16 at 211; *see also* N.T. PCRA Hearing, 12/31/19, at 45.

Next, Appellant writes that he and Kate proceeded upstairs, where they found Mitchell "passed out" in Appellant's bed. *See* PCRA Hearing, 12/31/19, at Com. Ex. 1. This contradicts Appellant's trial testimony where he alleged that he walked upstairs with Mitchell and engaged in oral sex at Mitchell's request, as well as Johnson's PCRA testimony that she never went upstairs or conversed with Appellant that night. *See* N.T. Jury Trial, 6/14-15/16, at 211. Instead, Appellant described Mitchell's alleged request for oral sex as Mitchell "must of (sic) been talking in [his] sleep," because he requested Appellant to perform oral sex on him. *See* PCRA Hearing, 12/31/19, at Com. Ex. 1.

Appellant went on to admit that he should have "never done it" and that if he had been "sober[, he] wouldn't have." *Id*. Within the messages, Appellant told Mitchell that "obviously you were blacked out" and admitted that he should have discontinued the assault, but did not because he was "shocked that it was actually happening." *Id*. at 5. Throughout the exchange, Mitchell repeatedly denied that he was aware of what was happening during the incident and asked Appellant to be honest with him about what occurred.

*Id*.   While Appellant disbelieved Mitchell's repeated denials, he ultimately admitted that they were both drunk.  *Id*.

Given the many inconsistencies between Appellant's two versions of events that were conveyed in his trial testimony and relayed in the text messages, we agree with the PCRA court that Appellant was not prejudiced by their absence.   Accordingly, we also find that since counsel was not ineffective for failing to investigate, uncover, present, or question Appellant about the December 2013 text messages, the PCRA court did not err when it denied his final two claims.

Having reviewed all of Appellant's issues and concluding that none warrants relief, we affirm the order of the PCRA court denying Appellant's petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/16/2021